UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————————

UNITED STATES OF AMERICA,

                    Plaintiff,                              REPORT & RECOMMENDATION

          v.                                               06-CR-6233L

WILEY McCLOUD,

                    Defendant.

—————————————————————

## BACKGROUND

By Order dated December 13, 2006, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 10).

Defendant Wiley McCloud ("McCloud") is charged in a three-count indictment. Specifically, the first count of the indictment charges McCloud with possessing with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Count Two charges McCloud with possessing a firearm in furtherance of the drug trafficking crime charged in Count One, in violation of 18 U.S.C. § 924(c)(1).  The final count charges McCloud with unlawfully possessing a firearm after having been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Each count alleges that the charged crime occurred on or about October 5, 2006.  (Docket # 9).

Currently pending before this Court are McCloud's motions to suppress statements and physical evidence.[1]  (Docket # 13).  The following constitutes the report and recommendation of this Court with respect to those motions.


## FACTUAL BACKGROUND

An evidentiary hearing relating to McCloud's suppression motions was conducted before this Court on March 5 and May 18, 2007.  At the hearing, the government offered the testimony of Investigator Nicholas Mazzola and Officers Warren Jones and Christopher Harden of the Rochester Police Department.  Based upon the credible testimony, the following is a summary of the relevant factual background.

During the early morning of October 5, 2006, Officers Jones and Harden were separately patrolling the northeast area of the city of Rochester, New York.  (Tr.A 4-5, 46).[2]  At approximately 1:06 a.m., the officers received a 911 radio dispatch reporting that a black male wearing a dark jacket and dark pants was "looking to break into cars" in the area of Maria Street and Cuba Place.  (Tr.A 5).  Jones and Harden both responded to the area within a few minutes, but did not observe any individuals in the immediate area or notice any vehicles that had been burglarized.  (Tr.A 6).  The officers briefly discussed the matter with one another and decided to

---

[1]  McCloud's omnibus motion also sought, *inter alia*, *Brady* material, *Jencks* material, discovery and inspection and rulings on evidentiary matters under Rule 404 of the Federal Rules of Evidence.  (Docket # 13).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on February 16, 2007.  (Docket ## 16, 17).

[2]  The transcript of the suppression hearing conducted before this Court on March 5, 2007, shall hereinafter be referenced as "Tr.A __."  (Docket # 19).

The transcript of the suppression hearing conducted before this Court on May 18, 2007, shall hereinafter be referenced as "Tr.B __."  (Docket # 32).

drive around and perform a "cursory search" to see if anyone in the area was "out and about." (Tr.A 6, 21, 58).  Jones began to search the area south of Cuba and Maria, and Harden headed north.  (Tr.A 24).  Jones testified that this particular area of the city is known to have a high incidence of criminal activity.  (Tr.A 9).

Harden testified that he observed a black male riding a bicycle and wearing a backpack on Joseph Avenue.  (Tr.A 71).  Before he was able to investigate that individual, he received a request for assistance by Jones to which he immediately responded.  (Tr.A 71).  Jones was searching the area of Upper Falls Boulevard, approximately one and one-half blocks from the intersection of Maria and Cuba, when he observed a black male, later identified as the defendant Wiley McCloud, wearing medium-colored blue jeans and a dark "hoodie" sweatshirt with the hood up.  (Tr.A 7-8, 29).  Jones testified that McCloud was not carrying anything, but he could not remember whether McCloud's hands were in or out of his pockets.  (Tr.A 25).  Jones observed that as he drove by in his patrol car, McCloud continued to walk and did not turn his head.  (Tr.A 8, 25).  At that time Jones did not have his emergency lights or siren activated, nor did he signal to McCloud that he should stop.  (Tr.A 31).  The time was approximately 1:13 a.m., and during the several-minute period between the radio dispatch and his observation of McCloud, Jones did not see any other persons in the area.  (Tr.A 9).

After passing McCloud, Jones turned his car around and returned.  Parking on the side of the street, Jones got out of his vehicle and asked, "Sir, can I speak to you for a second." (Tr.A 9, 32).  McCloud stopped walking, responded, "Yes," and reached into his back pocket to remove his identification.  (Tr.A 9-10).  McCloud handed his identification to Jones and asked why he had been stopped.  Jones explained that he was "checking the area for someone who

3

might be breaking into vehicles" and that he had stopped McCloud because he matched the description of the alleged perpetrator. (Tr.A 11, 28). Jones then instructed McCloud to put his hands behind his back and told him that he was going to "pat him down" for weapons. (Tr.A 12). Although Jones did not observe any bulges in McCloud's clothing or any other indication that McCloud might be carrying a weapon (Tr.A 34), he decided to conduct a weapons frisk. According to Jones, the frisk was justified by his knowledge that "people that are breaking into cars usually have on them a hammer or screwdriver" and "people in that general area at night have a tendency to carry small blades on them more for their personal defense." (Tr.A 13, 30).

As Jones reached towards McCloud to perform the patdown search, McCloud raised his hands "in a defensive posture" and pulled his shoulder away from Jones. (Tr.A 13). Jones explained to McCloud that he was only searching for weapons and that "he wasn't going to jail at this point in time." (Tr.A 14-15). Jones reached out for a second time. This time, according to Jones, McCloud "ran by [Jones], almost brushing shoulder to shoulder and knock[ing] [his] left arm out of the way." Jones followed immediately, not allowing McCloud to travel farther than a step or to break into a full run (Tr.A 40), grabbed him by the waist and tackled him to the ground. (Tr.A 15, 39-40, 61). McCloud got up and again attempted to run away, prompting Jones to pull him to the ground a second time. (Tr.A 15, 40). Throughout the struggle, McCloud repeatedly asked Jones why he was being arrested, and Jones repeatedly responded by asking McCloud why he was running. (Tr.A 19).

Officer Harden arrived as Jones was talking to McCloud and observed McCloud "tr[y] to run from Officer Jones." (Tr.A 61). He concurred that McCloud did not get more than a few feet before Jones tackled him. (Tr.A 61).

After the second takedown, McCloud was handcuffed and frisked for weapons. (Tr.A 16). Jones felt a hard object in McCloud's waistband that Jones identified as a firearm. (Tr.A 17, 42). Jones advised the other officers that he had located a gun, which he then removed from McCloud's waistband. Jones secured the weapon and stated to the other officers, "I'll clear this pistol, cover him and continue the search." (Tr.A 18, 43, 62). At that point McCloud stated, "Don't worry, that's the only gun I have." (Tr.A 19).

After the firearm seizure, McCloud was taken by Officer Harden to Rochester General Hospital for medical treatment of abrasions to his face and knee that he sustained when he was tackled by Jones. (Tr.A 20, 40, 47). While in the admittance area of the hospital, Harden noticed a small orange baggie containing a white substance on the floor near McCloud's seat. (Tr.A 49, 66). Harden picked the bag up, examined it and recognized the substance to be crack cocaine. (Tr.A 49). At that time McCloud was moved into a suture room for treatment and was seated on a bed. In that room, Harden again observed several baggies on the floor near McCloud's feet. (Tr.A 50). Harden picked up the bags and asked McCloud, "What's up with this?" (Tr.A 50, 66). McCloud smiled, stood up from the bed and stomped his feet. As he did so, several more baggies containing crack cocaine fell from McCloud's left pants leg; the bags were similar in appearance to the one Harden noticed in the admittance area. (Tr.A 50-51, 67). In total, Harden recovered approximately six baggies from the floor. (Tr.A 51).

Following the discovery, Harden searched McCloud for additional drugs. Concealed inside McCloud's pants legs and socks were two bags of crack cocaine and another bag containing a substance believed to be marijuana. (Tr.A 51, 67). Harden then asked another officer to stay with McCloud so that he could search the rear seat of the patrol car in which

McCloud had been transported.  Harden discovered another eight bags containing crack cocaine on the floorboards of the back seat of the police vehicle.  (Tr.A 52, 68).  Harden testified that he had searched the patrol car before transporting McCloud and no drugs had been present.  (Tr.A 52).

Investigator Mazzola arrived at the hospital after the narcotics were recovered and conducted an interview of McCloud while he was in the suture room.[3]  (Tr.A 79).  After entering the room, Mazzola introduced himself and advised McCloud of his *Miranda* rights by reading directly from a *Miranda* notification card.  (Tr.A 76; G.Ex. 1).  After advising McCloud of his rights, Mazzola asked him, "Do you understand what I just said to you?"  McCloud responded, "Yes, I do."  Mazzola then asked, "With these rights in mind, do you agree to talk with me now?" to which McCloud replied, "Yes."  (Tr.A 78-79).  Mazzola then began to question McCloud.  (Tr.A 79).  The interview occurred at approximately 2:32 a.m.  (Tr.A 79).

The interview lasted approximately ten minutes, after which Mazzola asked McCloud whether he would be willing to reduce his statement to writing.  McCloud agreed. Following his release from the hospital, Mazzola escorted McCloud to a patrol car where Mazzola produced a blank form and began questioning McCloud again about "all of what had occurred."  (Tr.A 82).  As McCloud reiterated his account, Mazzola recorded it on the statement form.  (Tr.A 82).  After a few minutes, McCloud indicated that he did not want to talk further without his lawyer present.  (Tr.A 83).  Mazzola then read aloud the portion of McCloud's

---

[3]  Harden testified that McCloud's abrasions were "consistent with road rash or a scuff on a hard surface" (Tr.A 54) and required only bandaging, not suturing.  (Tr.A 73).

statement that had been recorded and asked him whether that portion was accurate.  McCloud responded affirmatively, and the interview ended.  (Tr.A 81-83, 93).

McCloud did not complain about his injuries during the interview with Mazzola. (Tr.A 80).  Although McCloud stated that he had been drinking earlier in the evening, he did not appear to Mazzola to be under the influence of alcohol or drugs during the interview.  Rather, McCloud appeared coherent and responded appropriately to questions posed to him.  (Tr.A 80-81).  Mazzola testified that no threats or promises were made to McCloud in order to induce him to speak.  (Tr.A 84-85).

When the interview concluded, McCloud was transported to the Monroe County Jail where he was booked for possession of a weapon and narcotics.  (Tr.B 5).  Upon arrival at the jail, McCloud was photographed and turned over to the custody of the Monroe County Sheriff's Department.  (Tr.B 5-6).  The jail deputies escorted McCloud through a glass door into an area where he was searched.  Harden observed the search through the glass door as he waited for the deputies to return his handcuffs.  (Tr.B 6, 17).  Specifically, Harden testified that the deputies examined McCloud's pockets and searched his pants and socks, including the areas in which the narcotics had previously been discovered.  (Tr.B 6-7).  Harden testified that he was familiar with booking searches of the type performed on McCloud, that such searches are routine procedure at the jail and that their purpose is to ensure that no weapons or drugs are introduced into the jail and to inventory an arrestee's personal property.  (Tr.B 8).

**DISCUSSION**

McCloud moves to suppress the firearm and the narcotics seized, as well as the statements he made at the time of his arrest and at the hospital. (Docket # 13). The government opposes McCloud's motions.[4] To resolve the motions, the first inquiry is the lawfulness of Officer Jones's stop and seizure of McCloud. If they were without justification, the evidence subsequently seized should be suppressed as the fruit of the unlawful seizure. On the other hand, if the stop and seizure were justified, the Court must consider whether the narcotics and statements were lawfully obtained.

## I.   Initial Stop and Search of McCloud

The Fourth Amendment guarantees to all people the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Within that framework, all interactions between private citizens and law enforcement officials may be categorized into one of three types: consensual encounters, investigative detentions, or arrests. *See United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). To implicate the Fourth Amendment, the interaction must have amounted either to an investigative detention or an arrest; a consensual encounter, by contrast, would not trigger the protections of the Amendment. *Id.*

The least intrusive of the three interactions is the consensual encounter. A consensual encounter requires no justification – either by probable cause or reasonable suspicion – because the citizen is not seized, and thus no constitutional rights are implicated. *See United*

---

[4] The government does not contest the suppression of statements made by McCloud to Investigator Mazzola following his request for the assistance of a lawyer. (Tr.A 98).

8

*States v. Adegbite*, 846 F.2d 834, 837 (2d Cir. 1988) ("only if they were seized are defendants vested with any right to constitutional safeguards") (quoting *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1988)).  As the Supreme Court has recognized, "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred."  *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

The most intrusive of the three types of interactions is the arrest, and it requires a showing of probable cause.  For a warrantless arrest to be valid under the Fourth Amendment, the arresting officers must have probable cause to make the arrest at the time it is made.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  "[I]n general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested."  *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (citations omitted).  "The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, . . . but must constitute more than rumor, suspicion, or even a 'strong reason to suspect.'"  *Id.* (quoting *Henry v. United States*, 361 U.S. 98, 101 (1959)); *see Wong Sun v. United States*, 371 U.S. 471, 479 (1963).

The third type of interaction between law enforcement and private citizens is an investigative detention, often referred to as a *Terry* stop.  A *Terry* stop constitutes a more limited seizure than an arrest within the meaning of the Fourth Amendment and thus requires a more

modest showing by the government.  *Terry v. Ohio*, 392 U.S. at 30; *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S. 877 (1994).  Instead of probable cause, a *Terry* stop must be justified by "reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  *United States v. Scopo*, 19 F.3d at 781 (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994)); *see Terry*, 392 U.S. at 30 (police officer may lawfully conduct brief stop, without probable cause, if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot").  An officer conducting a *Terry* stop is permitted to detain the individual briefly "in order to investigate the circumstances that provoke[d] suspicion."  *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)).  During the stop, the officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions."  *Id.*  The detainee is not required to respond, however, and must thereafter be released unless his or her answers provide the officer with probable cause for an arrest.  *Id.*

During a lawful *Terry* stop, an officer may pat frisk the individual if the officer reasonably believes the person is armed and dangerous.  *Terry*, 392 U.S. at 29.  A pat frisk is not permitted simply because an individual has been stopped pursuant to a lawful *Terry* stop, *see United States v. McCargo*, 464 F.3d 192, 202 (2d Cir. 2006); rather, the officer must reasonably believe or suspect that the person to be frisked possesses a weapon.  *See Ybarra v. Illinois*, 444 U.S. 85, 93 (1979).  Evidence obtained as the result of an unjustified *Terry* stop "is subject to the

fruit of the poisonous tree doctrine" and may be suppressed.  *Scopo*, 19 F.3d at 781 (citing *United States v. Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. at 488.

On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant in fact subjected him to a search or seizure. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996).  Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, *United States v. Bayless*, 921 F. Supp. at 213, that the search or seizure did not violate the Fourth Amendment.  *United States v. Arboleda*, 633 F.2d at 989; *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

In analyzing whether a seizure has occurred, the Court must "consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *see also Brendlin v. California*, No. 06-8120, slip op. at 4-5 (June 18, 2007); *United States v. Springer*, 946 F.2d 1012, 1016 (2d Cir. 1991).  According to the Second Circuit, those circumstances include the following factors, the presence of which suggest that a seizure has occurred:

> [T]he threatening presence of several officers; the display of a
> weapon; physical touching of the person by the officer; language or
> tone indicating that compliance with the officer was compulsory;
> prolonged retention of a person's personal effects, such as airplane
> tickets or identification; and a request by the officer to accompany
> him to the police station or a police room.

*United States v. Hooper*, 935 F.2d 484, 491 (2d Cir. 1991) (citations omitted).  During a

consensual encounter, law enforcement is not required to advise the citizen that he or she is free

to leave or terminate the questioning.  *See id.* at 492.

In this case, I find that the credible testimony shows that the following occurred

on October 5, 2006.  At approximately 1:06 a.m., a 911 radio dispatch reported that an individual

described only as a black male wearing dark pants and a dark jacket was "looking to break into

cars" in the area of Maria Street and Cuba Place.  (Tr.A 5).  Within minutes, Officers Jones and

Harden responded to the area, but did not observe any persons nearby or notice any cars that had

been broken into.  (Tr.A 6).  The officers then separately searched the surrounding area – an area

known to have a high incidence of crime.  (Tr.A 9).  Harden searched the area to the north and

observed a black male riding a bicycle and carrying a backpack.  (Tr.A 71).  Before he could

question that individual, he responded to Jones's call for assistance.  (Tr.A 71).

Meanwhile Jones was searching the area to the south of Maria Street and Cuba

Place.  Approximately one to two blocks from the intersection of Maria and Cuba, Jones

observed McCloud, a black male, wearing medium-colored blue jeans and a dark hooded

sweatshirt with the hood up. (Tr.A 7-8).  McCloud was not carrying anything in his hands at the

time.  As Jones drove by in his patrol car, McCloud continued to walk without turning his head.

(Tr.A 8, 25).  Although this behavior appeared suspicious to Jones, he had not activated his emergency lights or siren, nor otherwise signaled to McCloud to stop.  (Tr.A 31).

Jones then turned his patrol car around, parked on the side of the road and called out to McCloud, "Sir, can I speak to you for a second?"  (Tr.A 9, 32).  McCloud did not attempt to flee, but agreed to talk to Jones and voluntarily offered his identification.  (Tr.A 9-10).  McCloud inquired why he had been stopped, and Jones explained that he was checking the area for someone who had been breaking into cars and that McCloud matched the description of the suspect.  (Tr.A 11, 28).  Following this explanation, Jones directed McCloud to put his hands behind his back to allow Jones to pat search him for weapons.  (Tr.A 12).

On this record, I find that the interaction between Jones and McCloud began as a consensual encounter which required no legal justification.  Jones's simple request that McCloud speak with him would not have suggested to a reasonable person that he or she was not free to leave.  *See Florida v. Bostick*, 501 U.S. at 439.  As the government concedes, however, the encounter quickly evolved into a *Terry* stop upon Jones's direction that McCloud put his hands behind his back and submit to a pat search for weapons.  (Tr.A 12).  Like the government, I believe that a reasonable person in McCloud's position would not have felt free to disregard Jones's instruction.  *See California v. Hodari D.*, 499 U.S. 621, 627 (1991) ("since the addressee [of a police order to stop] has no ready means of identifying the deficient [orders] it almost invariably is the responsible course to comply").  In fact, Jones himself testified that at that point during the encounter McCloud was not free to leave.  (Tr.A 16).

The question whether the *Terry* stop of McCloud was justified by reasonable suspicion is, in my view, a close one.  Indeed, had McCloud complied with Jones's initial

direction, I likely would find that the seizure was unsupported by reasonable suspicion.  At the time of that direction, Jones's suspicion was based upon (1) his belief that McCloud matched the description of the suspect; (2) McCloud's presence near the location of the alleged suspicious activity at a time close to the time of the 911 report; (3) the virtual absence of any other individuals present near the scene; (4) the fact that it was one o'clock in the morning in an area of the city known to have a high incidence of crime; (5) McCloud's failure to turn his head toward the patrol car when Jones first passed him; and (6) McCloud's unprompted production of his identification when Jones asked to speak to him.  It seems unlikely to me that these facts – taken alone or together – provided reasonable suspicion to justify a *Terry* stop of McCloud.

   The most that can be said about McCloud's physical description is that it was not inconsistent with the information provided in the 911 call.  I cannot say, however, that McCloud *matched* a description of the suspect because identification of race, even accompanied by a vague characterization of clothing, does not describe a suspect with sufficient detail or identifying characteristics to meaningfully set him apart from other members of the community.  *See United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005) ("race when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop").  Moreover, it is open to question whether McCloud's medium-colored blue jeans and hooded sweatshirt fit the description of dark pants and a jacket.

   While the presence of only one individual in the middle of the night immediately following a report of criminal activity in a specific location identified as the site of that reported criminal activity may be a factor worthy of consideration, *see United States v. Cooper*, 2006 WL 931511, *1 (W.D.N.Y. 2006) (reasonable suspicion to stop defendant justified because he

"generally fit the police dispatch of a person involved in aggressive panhandling, near in time and geographic location to the reported incident") (collecting cases); *cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime"), this consideration loses force when applied to the unique facts of this case. For one thing, McCloud was not the only individual observed by the investigating officers. Harden observed a second individual, a black male wearing a backpack, riding a bicycle in the area.  Indeed, the possession of a backpack perhaps should have given rise to greater suspicion that that person, not McCloud (who was not carrying any bag), was involved in burglarizing cars. For another, the location identified as the site of criminal activity was itself imprecise (the area of Maria Street and Cuba Place), rather than a specific building or address.

Further, without evidence of more evasive movement by McCloud, I am not persuaded that his failure to turn his head in the direction of a passing car in the middle of the night in a high crime area should be considered suspicious.  Nor am I persuaded that McCloud's unsolicited production of identification after Jones stopped him should be considered indicative of criminal activity, rather than cooperative instinct.  In short, I doubt that these facts establish reasonable cause for the *Terry* stop, particularly considering that the 911 report concerned *possible* criminal activity (someone "looking to break into cars" (Tr.A 5)) that had not been confirmed by the investigating officers.

My skepticism does not end the Fourth Amendment inquiry, however.  Rather, controlling caselaw compels me to consider whether the events that occurred between Jones's direction to McCloud to put his hands behind his back and his eventual takedown to the street

15

supply the quantum of proof sufficient to satisfy the reasonable suspicion standard. The reason this added analysis is required is because McCloud did not comply with Jones's direction.

The Supreme Court has made clear that a seizure implicating the Fourth Amendment requires either physical force or, "where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. at 626. Here, the record demonstrates that when Jones reached out to take hold of McCloud in order to perform the *Terry* stop, McCloud eluded his grasp, and Jones did not touch him. (Tr.A 38). Because there was no application of physical force at that time, the Court must consider whether Jones asserted authority over McCloud in another manner and, if so, whether McCloud submitted to that assertion of authority. I find that the answer to the first inquiry is affirmative; the second, negative.

The hearing testimony clearly establishes that as Jones approached McCloud, he directed him to put his hands behind his back so that Jones could search for weapons. That direction was an assertion of police authority over McCloud, whether lawful or not. Rather than doing what he was instructed, McCloud put his hands up, pulled away from Jones's attempted grasp and began to run. In other words, McCloud did not comply with Jones's direction and thus cannot be said to have submitted to the assertion of authority. *See United States v. Swindle*, 407 F.3d at 572-73 ("[r]egardless of how unreasonable it was for the officers to *order* him to pull over, and regardless of how reasonable it was for [the defendant] to have felt restrained in the face of the flashing police strobe light, there was no immediate 'physical force' applied or 'submission to the assertion of authority'") (quoting *Hodari D.*, 499 U.S. at 626), *cert. denied*, 546 U.S. 913 (2005). Indeed, the record shows that he did not comply with the order to submit to a pat frisk; rather, he was tackled to the ground.

16

The effect of this finding is to add McCloud's evasive movements and attempted flight to the mix of factors to be considered in determining whether reasonable suspicion existed to justify the seizure and patdown of McCloud.  While I believe that the issue remains a close one, I find that these facts tip the balance sufficiently to establish reasonable suspicion for the stop and seizure.  As the Supreme Court has acknowledged, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion . . . [and] [h]eadlong flight - whenever it occurs - is the consummate act of evasion: [i]t is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."  *Illinois v. Wardlow*, 528 U.S. at 124.

Although McCloud concededly advanced only a short distance before he was tackled the first time by Jones, I credit the testimony offered by Jones and Harden that McCloud had started to run.  That he sought to flee after being directed to submit to a pat search, and after being told that the purpose of the patdown was to search for weapons and that he had been stopped because he matched the description of someone suspected of breaking into cars, provided reason to suspect – when considered with the other circumstances discussed above – that criminal activity was "afoot" and that McCloud had a weapon.

This report and recommendation should not be read to suggest that I believe that reasonable suspicion exists to seize and pat frisk any individual who attempts to run in response to a law enforcement officer's direction to stop and submit to a weapons frisk.  This case does not present that question.  Rather, I find that a *Terry* stop and seizure is justified where officers observe an individual within a short distance and time from the location and time of suspected criminal activity, where that individual's race and clothing are consistent with the description of the suspect, where that individual is one of only a few individuals seen in "a high crime area,"

17

*see Wardlow*, 528 U.S. at 124 ("fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a *Terry* analysis"), and where that individual's behavior toward the officers changes markedly from cooperation to evasion and flight upon being advised that the officers are investigating criminal activity allegedly committed by someone whose description matches that individual and intend to perform a search for weapons.

In sum, I conclude that McCloud was not seized within the meaning of the Fourth Amendment until Jones first applied physical force against him, that is, when he first tackled McCloud.  *See Hodari D.*, 499 U.S. at 629 (seizure occurred when defendant was tackled, not when he was ordered, but failed, to stop).  By that time, reasonable suspicion existed to justify the seizure, as well as the pat frisk of McCloud that occurred immediately thereafter.  I further find that Jones's discovery of a weapon on McCloud during the frisk gave rise to probable cause to arrest him for possession of a weapon.

Having found that McCloud was lawfully frisked for weapons and arrested following the discovery of a firearm, this Court must now consider the statement made by McCloud at the time of his arrest, as well as the narcotics seized and statements made by McCloud following his transport to the hospital.  McCloud moves to suppress this evidence, arguing that it was obtained in violation of various of his constitutional rights.  The Court will address the evidence in the order in which it was discovered or obtained on the night of McCloud's arrest.

## II.  Statement Made by McCloud at Time of Arrest

Turning first to McCloud's statement, "Don't worry, that's the only gun I have,"
the question is whether the statement falls within the spontaneous utterance exception to
*Miranda v. Arizona*, 384 U.S. 436 (1966).  *Miranda* established the well-settled rule that the
government may not introduce as evidence a defendant's statements that are the product of
custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth
Amendment privilege against self-incrimination and then voluntarily waived that privilege.
*Miranda v. Arizona*, 384 U.S. 436 (1966).  As the Second Circuit Court has articulated,

> [c]ustodial interrogation exists when a law enforcement official
> questions an individual and that questioning was (1) conducted in
> custodial settings that have inherently coercive pressures that tend
> to undermine the individual's will to resist and to compel him to
> speak (the in custody requirement) and (2) when the inquiry is
> conducted by officers who are aware of the potentially
> incriminating nature of the disclosures sought (the investigative
> intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*,
834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).

If the court finds that the defendant was in custody at the time of the challenged
statements, it must then consider whether those statements were made in response to
interrogation by the officers.  "'Interrogation,' as conceptualized in the *Miranda* opinion, must
reflect a measure of compulsion above and beyond that inherent in custody itself."  *Rhode Island
v. Innis*, 446 U.S. 291, 300 (1980).  Interrogation includes direct questioning, as well as "any
words or actions on the part of the police (other than those normally attendant to arrest and
custody) that the police should know are reasonably likely to elicit an incriminating response

from the suspect," *Rhode Island v. Innis*, 446 U.S. at 301, or that would "produce psychological pressures that [would] subject the individual to the 'will' of his examiner." *United States v. Morales*, 834 F.2d at 38 (citations omitted). *See also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992); *United States v. Thomas*, 961 F. Supp. 43, 44-45 (W.D.N.Y. 1997).

Statements made spontaneously by a defendant are generally excepted from the *Miranda* requirements, however, because they are not the result of deliberate elicitation by the officers. *See Innis*, 446 U.S. at 299-300. As the Supreme Court has explained:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated . . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478; *see also Innis*, 446 U.S. at 299-300.

By the time Jones discovered the firearm in McCloud's waistband, McCloud was in custody, having been tackled to the ground by several officers. Jones announced his discovery to the other officers and directed, "I'll clear this pistol, cover him and continue the search." (Tr.A 18, 43, 62). Upon hearing Jones's direction, McCloud stated, "Don't worry, that's the only gun I have." (Tr.A 19).

I find that McCloud's statement was not made in response to any question or statement designed to elicit an incriminating response from him. As was clear from Jones's declaration, it was directed to his fellow officers and designed to apprise them of information bearing on their safety and to coordinate an appropriate response. Jones could not have

reasonably expected that McCloud would respond in an incriminating manner.  Accordingly, I

find that McCloud's statement, "Don't worry, that's the only gun I have" was not the product of

interrogation and was spontaneously made.  I thus recommend that McCloud's motion to

suppress this statement be denied.


III.   **Evidence Obtained During Hospital Visit**

Following his arrest, McCloud was transported to the hospital and treated for

abrasions he sustained when he was tackled by Jones.  (Tr.A 20, 40, 47).  While in the hospital,

several statements were made by McCloud, and numerous bags of narcotics were seized.

A.   **Narcotics Discovered on Hospital Floor:**  Officer Harden drove McCloud to

the hospital and escorted him into the admittance area.  In that area while waiting for McCloud to

be treated, Harden observed a small orange bag containing a white substance on the floor near

where McCloud was seated.  (Tr.A 49, 66).  Harden examined the bag and recognized the

substance to be crack cocaine.  (Tr.A 49).  Before Harden was able to investigate further,

McCloud was moved into a suture room for treatment.  In that room, Harden again observed

several bags on the floor near the bed on which McCloud was sitting.  Harden picked up the bags

and asked McCloud, "What's up with this?"  McCloud responded by smiling, standing up from

the bed and stomping his foot.  As he did this, several more bags containing crack cocaine fell

out of McCloud's pants leg.  (Tr.A 50-51, 67).

Addressing first the bags of narcotics discovered on the hospital floor (in the

admittance and suture areas), I find that they fall within the plain view exception to the Fourth

Amendment and should not be subject to suppression.  The plain view doctrine "authorizes

21

seizure of illegal or evidentiary items visible to a police officer whose access has some prior

Fourth Amendment justification and who has probable cause to suspect that the item is connected

with criminal activity." *Illinois v. Andreas,* 463 U.S. 765, 771 (1983).  Application of the plain

view exception requires first, that the officer have a legitimate right to be in the location from

which the object was plainly viewed; second, that the item's incriminating character be

immediately apparent; and third, that the officer have lawful access to the object.  *Horton v.*

*California*, 496 U.S. 128, 136-37 (1990).

   In the instant matter, Harden was in a public hospital when he observed bags on

the floor that he believed, based upon his training and experience, contained crack cocaine.

Their incriminating nature was immediately apparent to Harden, and no legal restriction

prohibited his access to the contraband.  Accordingly, I find that Harden's seizure of the bags of

crack cocaine from the floor of the admittance area and suture room was lawful.

   The question whether the narcotics that fell from McCloud's pants leg must be

suppressed is more complicated.  Those narcotics were discovered when Harden picked up the

bags from the floor of the suture room and asked McCloud, "What's up with this?"  McCloud

then stomped his foot causing more bags to fall from his pants leg.  In my view, Harden's

question plainly constituted custodial interrogation, which was not preceded by *Miranda*

warnings.  Indeed, the government itself appears to concede that McCloud was in custody and

that Harden's question was designed to elicit an incriminating response; it further admits that had

McCloud responded verbally to Harden's question, such response would be inadmissible.

(Docket # 23 at 12; Tr.A 95).  The government nonetheless believes that a different result should

obtain because McCloud's response was demonstrative rather than verbal.  (Docket # 23).  I disagree.

The government characterizes McCloud's action as "merely a meaningless physical response to a question."  (Docket # 23 at 12).  This characterization – which by its terms acknowledges that McCloud's action was a "response to a question" – belies its argument.  The act by McCloud of stomping his foot to reveal his possession of additional bags of narcotics was clearly made in *response* to Harden's *question*, "What's up with this?"  Because Harden's inquiry was designed to, and did in fact, elicit an incriminating response and was not preceded by a reading of the *Miranda* warnings, I find that it violated McCloud's Fifth Amendment rights.  I therefore recommend suppression of any testimony that McCloud stomped his feet to dislodge narcotics in response to Harden's question.

That said, the narcotics themselves should not be suppressed because they inevitably would have been discovered during the subsequent search of McCloud that occurred at the Monroe County Jail.  The inevitable discovery exception to the exclusionary rule "allows evidence initially detected as the result of unlawful government conduct to be introduced nonetheless 'if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'"  *United States v. Whitehorn*, 829 F.2d 1225, 1230 (2d Cir. 1987) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)), *cert. denied*, 487 U.S. 1237 (1988).  In applying this exception, the court must determine, "viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred."  *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992).  "[P]roof of inevitable discovery 'involves no speculative elements but

focuses on demonstrated historical facts capable of ready verification or impeachment and does

not require a departure from the usual burden of proof at suppression hearings.'"  *Id.* (quoting

*Nix v. Williams*, 467 U.S. at 444).  As the Supreme Court explained in *Nix*:

> [T]he interest of society in deterring unlawful police conduct and
> the public interest in having juries receive all probative evidence of
> a crime are properly balanced by putting the police in the same, not
> a *worse*, position than they would have been in if no police error or
> misconduct had occurred.

*Nix*, 467 U.S. at 443.

Here, Harden testified that after McCloud was released from the hospital, he was

transported to the jail to be booked because he was under arrest for possession of narcotics and a

firearm.  (Tr.B 5).  Upon arrival, McCloud was photographed and turned over to the custody of

the Monroe County Sheriff's deputies working in the jail.  (Tr.B 5-6).  Harden observed the

deputies escort McCloud through a glass door and perform a search of McCloud's person.

According to Harden, the deputies searched McCloud's pockets, pants and socks, including the

areas in which the narcotics had previously been concealed.  (Tr.B 6-7).  Harden testified, based

upon his examination, that the search was performed in accordance with the jail's standard intake

procedures, which require such a search of all persons arrested and booked in order to ensure that

contraband is not introduced into the jail and that an arrestee's personal property is properly

inventoried.  (Tr.B 8).  He further testified that he was familiar with the purpose of the booking

search through his training, as well as through his frequent contact with deputy sheriffs employed

at the jail.  (Tr.B 18).

On this record, I find that any narcotics that McCloud was concealing in his pants

or socks, had they not been seized from him earlier, would have been inevitably discovered

during the routine booking search.  *See Illinois v. Lafayette*, 462 U.S. 640, 644-47 (1983)

(establishing jail intake search as an exception to the warrant requirement).  Accordingly, the

bags of narcotics discovered at the hospital should be admissible.

  **B.  Narcotics Seized From McCloud's Person:**  After seizing the narcotics that

fell from McCloud's pants, Harden searched McCloud to determine if he had more drugs on his

person.  The search revealed two additional bags of crack cocaine and another bag containing

marijuana hidden in McCloud's pants and socks.  (Tr.A 51, 67).  Although the government has

not clearly articulated its rationale for admitting this evidence, I find that the search of McCloud

was justified and the recovered narcotics should not be suppressed.

   First, although McCloud had already been arrested for possession of a firearm, the

discovery of the bags of crack cocaine on the hospital floor justified charging McCloud with

possession of narcotics.  Indeed, Harden testified that when McCloud was taken to the jail he was

under arrest both for possession of a weapon and possession of narcotics.  (Tr.B 5).  That

probable cause existed to arrest him for narcotics, as well as weapons offenses, entitled Harden to

search McCloud incident to arrest, *see, e.g.*, *United States v. Robinson*, 414 U.S. 218, 225-26

(1973); *Chimel v. California*, 395 U.S. 752, 762-63 (1969); *United States v. Campbell*, 959

F. Supp. 606, 611 (W.D.N.Y. 1997), *aff'd*, 152 F.3d 921 (2d Cir. 1998), and Harden in fact

searched him promptly following his observation of several bags of crack cocaine that fell from

McCloud's pants leg.

   In any event, even if Harden's search of McCloud at the hospital had been

improper, the narcotics concealed in his pants and socks nonetheless would have been inevitably

discovered during the subsequent intake search at the jail.  *See United States v. Eng*, 971 F.2d at

861; *Nix*, 467 U.S. at 447.  Harden testified that the jail deputies searched McCloud's pants and

socks, including the areas from which he had recovered the narcotics.  (Tr.B 6-7).  In other

words, those bags would have been discovered during the booking search had McCloud not been

searched at the hospital.  I therefore recommend denial of McCloud's motion to suppress the

bags of crack cocaine discovered on his person.

        **C.  <u>Narcotics Seized From Police Car</u>:**  McCloud also moves to suppress the

bags of crack cocaine discovered on the floor of Harden's police car.  After seizing the narcotics

in the hospital, Harden asked another officer to take custody of McCloud so that he could search

the patrol car in which McCloud had been transported to the hospital.  On the floorboards of the

rear seat of that car, Harden found eight small bags containing crack cocaine similar in

appearance to those discovered on the floor and on McCloud's person.  (Tr.A 52, 68).  Harden

testified that he had searched the car prior to transporting McCloud and that no narcotics had

been present at that time.  (Tr.A 52).

        I find that McCloud abandoned the narcotics found in the car and thus lacks

standing to challenge their admissibility.  Although the Fourth Amendment guarantees protection

against unreasonable searches and seizures, that protection does not extend to property

voluntarily abandoned.  *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990) (citing *United*

*States v. Moskowitz*, 883 F.2d 1142, 1147 (2d Cir. 1989)); *see United States v. Springer*, 946

F.2d at 1017 ("It is settled that the warrantless seizure of property that has been abandoned does

not violate the Fourth Amendment") (citing *Abel v. United States*, 362 U.S. 217 (1960)).

"[W]hen a person voluntarily abandons property, . . . he forfeits any reasonable expectation of

privacy that he might have had in the property." *United States v. Lee*, 916 F.2d at 818 (citing

*United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987), *cert. denied*, 507 U.S. 954 (1993)).

McCloud contends that he did not voluntarily abandon the narcotics in the police

car.  According to McCloud, he abandoned the drugs as the result of his unlawful seizure and

arrest.  That unlawful seizure therefore tainted his abandonment of the narcotics and rendered it

involuntary, McCloud further contends.  (Docket # 20 at 4).  *See United States v. Morin*, 665

F.2d 765, 770-71 (5th Cir. 1982) (defendant's abandonment of property not voluntary because

tainted by unlawful arrest); *United States v. Maryland*, 479 F.2d 566, 568 (5th Cir. 1973) ("[a]

loss of standing to challenge a search cannot be brought about by unlawful police conduct").

McCloud's argument is unavailing in view of my earlier finding that the police

lawfully frisked and arrested McCloud.  Thus, McCloud's abandonment of the narcotics in the

patrol car cannot be said to be the fruit of an unlawful arrest.  Accordingly, because his

abandonment was voluntary, McCloud lacks standing to challenge the crack cocaine seized from

the rear seat of the patrol car.


## IV.  Statements Made by McCloud During Interview

The final motion raised by McCloud relates to the statements he made during the

interview with Investigator Mazzola.  As previously noted, the government may not use a

defendant's statements that are the product of custodial interrogation unless it demonstrates that

the defendant was first warned of his Fifth Amendment privilege against self-incrimination and

then voluntarily waived that privilege.  *Miranda*, 384 U.S. at 436.  It is undisputed in this case

that McCloud was in custody and subjected to interrogation during the interview with Mazzola. The question is whether McCloud validly waived his *Miranda* rights.

To establish a valid waiver, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

Mazzola testified that he arrived at the hospital at approximately 2:32 a.m. and encountered McCloud in the suture room. (Tr.A 79). After entering the room, Mazzola introduced himself and advised McCloud of his *Miranda* rights by reading from a *Miranda* notification card. (Tr.A 76; G.Ex. 1). After reading the rights, Mazzola asked McCloud, "Do you understand what I just said to you?", and McCloud responded, "Yes, I do." Mazzola then asked, "With these rights in mind, do you agree to talk with me now?" McCloud again responded in the affirmative. (Tr.A 78-79). Following this waiver, Mazzola began to question McCloud relating to the events that had transpired that night. (Tr.A 79).

When the questioning ended, McCloud was released from the hospital and Mazzola asked him whether he was willing to reduce his statement to writing. McCloud agreed. Mazzola produced a blank statement form and began reviewing with McCloud "all of what had occurred." (Tr.A 82). This time, Mazzola recorded McCloud's statements on the form. (Tr.A 82). After only a few minutes, McCloud indicated that he did not want to talk any further without his lawyer present. (Tr.A 83). Mazzola then read to McCloud the portion of the

statement that had been recorded to that point and asked him whether it was accurate.  McCloud indicated that it was, and the interview ended.  (Tr.A 81-83, 93).

   The government does not oppose McCloud's motion to suppress as it relates to any statements made after McCloud requested the assistance of an attorney.  (Tr.A 98).  It argues, however, that the preceding statements were made pursuant to a voluntary and knowing *Miranda* waiver.  This Court agrees.  The credible testimony clearly demonstrates that Mazzola advised McCloud of his *Miranda* rights and that McCloud agreed to waive his rights and speak with the investigator.  Further, Mazzola testified that McCloud did not complain about any injuries during the interview, nor were any threats or promises made to McCloud in order to induce him to speak.  (Tr.A 80, 84-85).  Finally, McCloud did not appear to be under the influence of alcohol or drugs, but rather acted coherently and responded appropriately to questions asked of him.  (Tr.A 80-81).

   On this record, I find that McCloud knowingly and voluntarily waived his *Miranda* rights.  It is therefore my recommendation to deny McCloud's motion to suppress statements he made prior to invoking his right to the assistance of counsel.  The government should not be permitted, however, to elicit testimony that McCloud confirmed the accuracy of the written statement because that exchange occurred after McCloud requested an attorney.

## <u>CONCLUSION</u>

For the foregoing reasons, it is my recommendation that McCloud's motion to suppress statements and tangible evidence **(Docket # 13)** be **GRANTED in part and DENIED in part**.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      August   16  , 2007

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **<u>Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.</u>**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

       *s/Marian W. Payson*
        MARIAN W. PAYSON
       United States Magistrate Judge

Dated: Rochester, New York
      August __16__, 2007

---

[5]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).